839 F.2d 809
 127 L.R.R.M. (BNA) 2854, 268 U.S.App.D.C. 130,
108 Lab.Cas. P 10,312
 INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS, AFL-CIO
v.
TRANS WORLD AIRLINES, INC., Appellant.
TRANS WORLD AIRLINES, INC., Appellant, Deborah K. Boller, et al.
v.
NATIONAL MEDIATION BOARD, et al.
TRANS WORLD AIRLINES, INC., Appellant, Deborah K. Boller, et al.
v.
NATIONAL MEDIATION BOARD, et al.
 Nos. 87-5092, 87-5093 and 87-5176.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 7, 1988.
Decided Feb. 19, 1988.
As Amended June 1, 1988.*
 
 Appeals from the United States District Court for the District of Columbia (Civil Action Nos. 86-01912 and 86-02980).
 Eric Rosenfeld, New York City, for appellant Trans World Airlines. Deborah A. Folloni and Ronald A. Lindsay, Washington, D.C., entered appearances for appellant Trans World Airlines.
 Michael E. Avakian, North Springfield, Va., for appellants Deborah K. Boller, et al.
 Mark W. Pennak, Atty., Dept. of Justice, with whom, Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., Ronald M. Etters, General Counsel, Nat. Mediation Bd. and John F. Cordes, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellees Nat. Mediation Bd. William Kanter, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for appellee Nat. Mediation Board.
 John A. Edmond, with whom Joseph Guerrieri, Jr., Washington, D.C., was on the brief, for appellee Intern. Ass'n of Machinists and Aerospace Workers.
 Before RUTH BADER GINSBURG, WILLIAMS, and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SENTELLE.
 SENTELLE, Circuit Judge:
 
 
 1
 These three consolidated appeals concern union representation of passenger service employees of Trans World Airlines, Inc. (TWA). In the District Court, TWA and the individual plaintiffs sought to set aside the National Mediation Board (NMB) certification of the International Association of Machinists and Aerospace Workers (IAM) as bargaining representative. IAM sought an order requiring TWA to commence bargaining and enjoining TWA from altering wages, rules and working conditions, and to retroactively restore conditions to those that existed on May 23, 1986 (the date on which IAM was certified as the bargaining representative for the passenger service employees). The District Court held that the certification of IAM as the bargaining representative was unreviewable pursuant to Switchmen's Union v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943). The District Court then ordered TWA to commence bargaining and enjoined prospective, unilateral changes in working conditions. TWA appeals both the certification and the injunction against prospective unilateral changes. As to the first of those questions, we find no error and affirm. As to the second, we reverse.
 
 I.
 
 2
 The threshold question is whether this Court should reverse the District Court and vacate the NMB certification of IAM as the representative of TWA's passenger service employees. If we answer this issue in favor of TWA and against IAM, the injunction becomes void. TWA's attack on the certification is grounded on the NMB's decision to exclude from the representation election TWA passenger service employees serving as temporary flight attendants while regular flight attendants were on strike. The relevant facts are set out in detail in the District Court's opinion, International Association of Machinists v. TWA, Inc., 654 F.Supp. 447 (D.D.C.1987), and we will repeat only those necessary to an understanding of this decision.
 
 
 3
 The employees in question, including individual plaintiffs in this action, were concededly on temporary assignment as flight attendants. All were regularly employed as passenger service employees within the bargaining unit relevant to the controversy out of which the disputed election arose. As passenger service employees, they enjoyed higher wages than flight attendants and accepted the volunteer assignments after TWA's announcement that they would retain their current job title, salary, benefits, status, and seniority. Nonetheless, since the employees were actually working in "another craft or class" on the date of the election, the NMB declared them ineligible, purportedly on the basis of its prior decision in Trans World Airways, Inc., 8 N.M.B. 663 (1981). In that opinion, the employees in question, rather than being on temporary assignment, were actually on permanent assignments but sought eligibility to vote in prior positions as to which they retained "recall" rights. The affected employees in the case before us, together with TWA, suggest that the prior NMB decision is plainly distinguishable since the employees in the prior case had a "present interest in their present craft or class" not paralleled by the concededly temporary flight service attendants who desired to vote in the craft or class of their regular employment. TWA and the individual plaintiffs contend that this resulted in unfairness and was not supported by the evidence before the Board.
 
 
 4
 The election was in fact a very close one. Certification would be granted only if a majority of eligible voters cast ballots in favor of representation. The decertification decision, with reference to the individual plaintiffs and others of their class, was made after all ballots had been received. 1,279 eligible voters cast ballots for IAM, 935 for International Brotherhood of Teamsters, and 36 for the IFFA. Thus, 2,250 valid ballots were cast in favor of representation. The total number of eligible voters was 4,330 so that 51.96% voted in favor of representation. Had the 302 questioned employees been eligible, the 2,250 votes cast would have amounted to only 48.88%, and certification would not have been in order. It was on this basis that TWA and the individual plaintiffs prayed the District Court to void the certification.
 
 
 5
 They argue that under the Board's own representation manual, revised edition effective on November 1, 1985, temporary employees of the sort represented by plaintiffs here should have been counted in their regular craft. Section 5.302 of that manual reads:
 
 
 6
 Employees who are working regularly in another craft or class on the same carrier will be considered ineligible to participate in the craft or class involved in the Board representative's investigation. (Emphasis supplied).
 
 
 7
 Plaintiffs contend that under no reasonable construction of "regularly" can these employees be found ineligible. Certainly, their argument is an appealing one. Unfortunately for plaintiffs, both the District Court and this Court are without the power to grant the relief prayed. Judicial review of NMB decisions is one of the narrowest known to the law. As the District Court noted, "It has been established for over twenty years that courts have no authority to review NMB certification decisions in the absence of the showing on the face of the pleadings that the certification decision was a gross violation of the Railway Labor Act or that it violated the constitutional rights of an employer, employee, or Union." 654 F.Supp. at 450. Citing Brotherhood of Railway and S.S. Clerks v. Association for the Benefit of Noncontract Employees, 380 U.S. 650, 658-60, 661-62, 85 S.Ct. 1192, 1196-97, 1198-99, 14 L.Ed.2d 133 (1965); Switchmen's Union of North America v. National Mediation Board, 320 U.S. 297, 303, 64 S.Ct. 95, 98, 88 L.Ed. 61 (1943), inter alia.
 
 
 8
 In the instant case, plaintiffs contend that the pleadings reflect such a gross violation of the statute in that the Board's decision to decertify the decisive block of eligible voters on so tenuous a basis after the cut-off of eligibility date and the receipt of all ballots violates a statutory duty of neutrality. However, there is no express statutory duty of neutrality, even if plaintiffs' complaints were taken to adequately allege a violation of such duty.[1] And the "peek at the merits" permitted to this Court when reviewing NMB decisions, IBT v. BRAC, 402 F.2d 196, 205 (D.C.Cir.1968), cert. denied sub nom. BRAC v. NMB, 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119 (1968), does not disclose a "gross violation of the statute."
 
 
 9
 Similarly unavailing is plaintiffs' argument that the Board's disenfranchisement of the temporary flight attendants constitutes a violation of constitutional rights. The disenfranchised voters and TWA claim that the voters' "right of association" was violated by NMB's decertifying them, which they contend was for associating with TWA. They offered the District Court no authority for this proposition, nor have they offered any here, nor indeed have we independently found any such authority. While the treatment of these employees certainly does not cast the NMB in a very favorable light, that treatment does not reach the level of violating a constitutional right, and we are constrained to hold, for the reasons stated by the District Court, that plaintiffs have failed to demonstrate either a gross violation of the Railway Labor Act, 45 U.S.C. Sec. 151 et seq.,[2] or any violation of the Constitution. Therefore, under the principles set forth in Switchmen's Union v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943), the certification of the IAM as bargaining representative is not reviewable.
 
 II.
 
 10
 TWA's challenge to the District Court injunction against unilateral change of working conditions is more troublesome. After certification, TWA refused to treat with the newly certified representative pending resolution of litigation over the validity of the certification and made unilateral changes in working conditions, specifically by giving flight attendants a role in passenger pre-boarding--"a change that, however desirable as an economy or an efficiency, would have been clearly bargainable if a collective bargaining agreement had been in place." 654 F.Supp. at 452. IAM prayed the District Court to order TWA to bargain in good faith, which the District Court did; to roll back the unilateral change in working conditions, which the District Court refused; and to enjoin TWA from making further unilateral changes in working conditions pending the entry of a collective bargaining agreement.[3] In considering the third section of IAM's prayer for injunctive relief, the District Court weighed relevant authorities to determine that TWA's refusal "to negotiate with the IAM over the wages, rules, and working conditions of its passenger service employees despite ... certification by the National Mediation Board," was a violation of "Section 2, First, Fourth, and Ninth of the Railway Labor Act, 45 U.S.C. Sec. 152, First, Fourth, and Ninth." 654 F.Supp. at 456. The District Court then ordered that TWA "be enjoined from making any further unilateral changes in the wages, rules, and working conditions of the passenger service employees prior to the exhaustion of the dispute resolution procedures of the Railway Labor Act. 45 U.S.C. Sec. 156." Id. at 456. In so doing, the District Court overstepped its statutory authority.
 
 
 11
 As the District Court noted, paragraph Seventh of 45 U.S.C. Sec. 152[4] provides that:
 
 
 12
 No carrier ... shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section 156....
 
 
 13
 The referenced section suspends "intended change[s] in agreements affecting rates of pay, rules, or working conditions" during a waiting period and mediation or an opportunity for mediation by the NMB. 45 U.S.C. Sec. 156.[5] However, as the District Court also noted, the Supreme Court in Williams v. Jacksonville Terminal Co., 315 U.S. 386, 62 S.Ct. 659, 86 L.Ed. 914 (1942), held that the injunctive power granted by Section 6 for the preservation of the status quo is limited by the terms of the Act to those situations in which the status quo reflects a pre-existing collective bargaining agreement. The Williams case, like the case at bar, involved an attempt by the Union to enjoin changes in working conditions when no collective bargaining agreement was in place. That opinion expressly holds:
 
 
 14
 The institution of negotiations for collective bargaining does not change the authority of the carrier. The prohibitions of Sec. 6 against change of wages or conditions pending bargaining and those of Sec. 2, Seventh, are aimed at preventing changes in conditions previously fixed by collective bargaining agreements. Arrangements made after collective bargaining obviously are entitled to a higher degree of permanency and continuity than those made by the carrier for its own convenience and purpose.
 
 
 15
 Id. at 403, 62 S.Ct. at 669. The District Court recognized this limitation from Williams but noted that later Supreme Court cases evidence an erosion in the principle set forth in that case.
 
 
 16
 In Detroit and Toledo Shore Line R.R. v. United Transportation Union, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969), the Supreme Court considered a case in which a previous collective bargaining agreement was in place but management made unilateral changes in working conditions as to subjects not expressly covered in that agreement. Justice Black, writing for the Court, noted that "[t]he Railway Labor Act was passed ... to encourage collective bargaining by [carriers] and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce." Id. at 148, 90 S.Ct. at 298 (footnote omitted). He further noted that the status quo provisions of the Act were central to its design and that Sections 5, 6, and 10 "together with Sec. 2 First, form an integrated, harmonious scheme for preserving the status quo from the beginning of the major dispute[6] through the final 30-day 'cooling off' period." Id. at 152, 90 S.Ct. at 300. The Court then held that "the status quo extends to those actual, objective working conditions out of which the dispute arose, and clearly these conditions need not be covered in an existing agreement." Id. at 153, 90 S.Ct. at 301. The Court then distinguished the Williams decision as being one in which there was no pre-existing collective bargaining agreement while the Detroit and Toledo situation presented an existing agreement which did not cover the specific working conditions subjected to the unilateral change. At this point, the Court described Williams in language that indicated erosion of the precedential force of that decision:
 
 
 17
 In Williams there was absolutely no prior history of any collective bargaining or agreement between the parties on any matter. Without pausing to comment upon the present vitality of either of these grounds for dismissing the ... Railway Labor Act claim [in Williams ] it is readily apparent that Williams involved only the question of whether the status quo requirement of Sec. 6 applied....
 
 
 18
 Id. at 158, 90 S.Ct. at 303. As the District Court notes, this certainly casts some doubt on the continuing willingness of the Supreme Court to follow the Williams precedent in a case not factually distinguishable from it. However, Detroit and Toledo plainly stops short of overruling Williams and leaves it binding in a case like the one before us where there has been "absolutely no prior history of any collective bargaining or agreement between the parties on any matter." Id.
 
 
 19
 Since the Detroit and Toledo opinion, the Supreme Court has signaled a further erosion of the Williams principle in Chicago and North Western R.R. v. United Transportation Union, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971). In that case there had been a prior collective bargaining agreement but that agreement had expired and the mediation process was complete. Therefore, like the case at bar, there was no immediately enforceable collective bargaining agreement on any subject. The Union prepared to strike. Management sought to enjoin the Union. Thus, as in the case at bar, one party to the negotiation sought to judicially prevent the other from invoking self-help. The Supreme Court found the substance of the complaint before it to be the Union's alleged failure to perform its obligations under Section 2, First, which imposes upon management and labor the duty "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes...." 45 U.S.C. Sec. 152, First (emphasis supplied). The Court, after weighing the legislative history, determined that Section 2, First, imposed a legal duty upon the parties independent of the duties under Section 6, holding:
 
 
 20
 [W]e think it plain that Sec. 2 First, was intended to be more than a mere statement of policy or exhortation to the parties; rather, it was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis.
 
 
 21
 Id. at 577, 91 S.Ct. at 1735. And, the Court further held that these "appropriate means" could include injunction against a strike. It would seem apparent that the power to enjoin the Union's self-help measure--strikes--implies the concomitant power to enjoin management's self-help measure--a potentially strike-provoking unilateral change in work conditions. This seems particularly true when in each instance the power is aimed at enforcing the same duty arising out of Section 2, First, as quoted above and furthering the congressional goal of maintaining uninterrupted interstate commerce as described by Justice Black.
 
 
 22
 Therefore, while the legal foundation of the District Court's power to issue an injunction like the one issued here does exist, nonetheless, the Williams case holding, though weakened, is not dead. None of the Supreme Court cases cited above and no other case, before or since, has overruled Williams. Thus, no power to enjoin unilateral changes in working conditions by management flows from Section 6 of the Act in the absence of pre-existing, in place, collective bargaining agreements. The independent duty found by the Court under Section 2, First, in the Chicago and North Western case is a limited one. The Court expressly held that the injunctive remedy would be available only "where a strike injunction is the only practical, effective means of enforcing the command of Sec. 2 First." 402 U.S. at 582, 91 S.Ct. at 1738. Plainly the same restrictive test should apply in enjoining self-help by management. In Burlington Northern R.R. v. BMWE, --- U.S. ----, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987), the Supreme Court underscored the limited circumstances under which this drastic remedy is available stating "[c]ourts should hesitate to fix upon the injunctive remedy ... unless that remedy alone can effectively guard the plaintiff's right." Id. at ----, 107 S.Ct. at 1851 (quoting International Assn. of Machinists v. Street, 367 U.S. 740, 773, 81 S.Ct. 1784, 1802, 6 L.Ed.2d 1141 (1961)).[7]
 
 
 23
 While the District Court's opinion in the case before us does quote the limiting language from Chicago and North Western R.R. to the effect that the injunction is "the only practical, effective means" of enforcing a duty imposed by the Railway Labor Act, in this case that finding is not at this time supported by the record. In Chicago and North Western all the procedures for negotiations, mediation, and "cooling off" period had been attempted before resort to the injunctive measure. Here, the first steps had not yet been taken when the final leap occurred. Therefore, we are constrained to conclude that so long as Williams remains the law, the District Court lacks the power to employ this drastic measure, absent a showing of unavailability or ineffectiveness of other remedies. Thus, as to this assignment of error and this one only, we reverse the decision of the trial court, while affirming that decision in all other particulars. In short, the order of the District Court is affirmed in part, and reversed in part.
 
 
 
 *
 The Order amending this opinion is published at 848 F.2d 232
 
 
 [1]
 The use of the word "neutral" in the statute occurs in fact at 45 U.S.C. Sec. 152, Ninth, "in the conduct of any election for the purposes herein indicated, the Board shall designate who may participate in the election and establish the rules to govern the election, or may appoint a committee of three neutral persons who after hearing shall within 10 days designate the employees who may participate in the election." (Emphasis supplied). The word neutral does not occur as an adjective modifying the Board itself
 
 
 [2]
 The provisions of the Railway Labor Act, except 45 U.S.C. Sec. 153, are applicable to airlines. 45 U.S.C. Sec. 181
 
 
 [3]
 The first two rulings in the District Court's injunction are not under attack here and are in accordance with fixed principles of railway labor law. See generally 45 U.S.C. Sec. 152 and authorities collected in International Association of Machinists & Aerospace Workers v. Trans World Airlines, Inc., 654 F.Supp. 447 (D.D.C.1987)
 
 
 [4]
 This section is also referred to hereinafter as "Section 2."
 
 
 [5]
 This section is also referred to hereinafter as "Section 6."
 
 
 [6]
 The Detroit and Toledo case defines " 'a major dispute' [as] one arising out of the formation or change of collective agreements covering rates of pay, rules, or working conditions." Id. at 145 n. 7, 90 S.Ct. at 296 n. 7 (emphasis supplied) (citations omitted)
 
 
 [7]
 Burlington Northern R.R. v. BMWE is also one of a long line of cases making plain that the anti-injunction provisions of the Norris-La Guardia Act, 29 U.S.C. Secs. 101-115, do not prevent the strike injunctions, above discussed, in appropriate limited circumstances. See, e.g., Chicago and North Western R.R. v. Transportation Union, supra 402 U.S. at 581, 91 S.Ct. at 1737, and authorities collected therein